## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| ANGELA MYERS, OSCAR RODRIGUEZ, PAUL SUTTON, TREVOR ADKINS, BRENT RISH, DEREK SAMMELMAN, and MARY MARTIN, on Behalf of Themselves and All Others Similarly Situated, | Case No.: |
| Plaintiffs,<br>v. | **CLASS ACTION COMPLAINT** |
| NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, INC. and NASCAR DIGITAL MEDIA, LLC, | **<u>DEMAND FOR JURY TRIAL</u>** |
| Defendants. | |

Plaintiffs Angela Myers, Oscar Rodriguez, Paul Sutton, Trevor Adkins, Brent Rish, Derek Sammelman, and Mary Martin ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this class action complaint against defendants National Association for Stock Car Auto Racing, Inc. ("NASCAR") and NASCAR Digital Media ("NDM") (collectively "NASCAR" or "Defendant"). On the NASCAR website at https://www.nascar.com/ (the "Website"), NASCAR utilized tracking tools created by Facebook, without seeking or obtaining subscribers' consent, which resulted in violation of the Video Privacy Protection Act (VPPA).  Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to

those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

## **NATURE OF THE ACTION**

1.     This is a class action brought on behalf of all persons who subscribed to the NASCAR Website owned and operated by Defendant.

2.     The Website provides users with access to articles, driver statistics, video content, and more related to the NASCAR racing, including pre-recorded clips of races, race highlights, interviews with drivers and team staff, sports analysts, and more.

3.     As of 2012, NASCAR took direct control over the operations of its Website.

4.     On the Website, visitors are solicited to subscribe to e-newsletters. The Website's newsletter subscribers are offered email updates regarding NASCAR events, drivers, and content on the Website in exchange for their contact information, as depicted below:



*Figure 1 - The Website newsletter sign-up[1]*

5.    The newsletter email updates that result from subscription to the Website's newsletters include links to the Website, with direct links to articles and pre-recorded videos for subscribers to watch on the Website.

6.    NASCAR, including the video component of its business (*see* Sections B and C(c)), benefits from subscriptions to the Website's newsletter.  The subscriptions to newsletter emails provide NASCAR with a host of benefits, including revenue generation, positive marketing, and driving traffic to the Website.  *See, infra, Section E.*

7.    The Website contains pre-recorded video content. This content is hosted by NASCAR and made available to be requested or watched on the Website by NASCAR. The video content on the site is owned and

---

[1] *The NASCAR® Newsletter*, NASCAR https://www.nascar.com/newsletters/ (last visited August 2, 2023).

3

copyrighted by NASCAR and, in many instances, created by NASCAR itself. In all instances, the web watching of these videos is tracked by NASCAR as a result of its decision to place the Pixel on each individual page containing its video content on the Website. Based on the investigation conducted on behalf of Plaintiffs, NASCAR has produced at least 15,000 videos for the Website.[2]

8.    Defendant does not disclose that subscribers' personal identifying information ("PII") would be captured by the Facebook Pixel (referred to as the "Pixel," discussed and defined herein), and then transferred to Facebook. The Website does not inform site subscribers or site visitors that their PII will be exposed, available and readily usable by any person of ordinary technical skill who receives that data. At no point during or after the subscription sign up process – or anywhere on the Website for that matter – does Defendant seek or obtain consent for the sharing of subscribers' PII and web watching history, which NASCAR surreptitiously gathered through the use of the Pixel that it chose to employ on the website.

---

[2] NASCAR's sitemap index contains 16 separate video sitemaps for the website, each containing a list a of video URLs, including the date each webpage containing the video was last modified. Between the 16 video-related sitemaps listed, a total of 15,015 video URLs. *See XML Sitemap,* NASCAR *https://www.nascar.com/sitemap_index.xml (last visited August 2, 2023).*

9. In today's data driven world, a company's data sharing policies for a service or subscription are important factors for individuals to consider in deciding whether to provide personal information to that service or commit to a subscription.

10. Congress has recognized the immediate and irreversible harm caused by associating and disclosing a person's personally identifiable information in conjunction with their video watching.

11. Congress' enactment of the VPPA, and its continued endorsement of the statute, supports that recognition. The VPPA prohibits video tape service providers,[3] such as Defendant, from sharing subscribers' PII tied to the title, description, or subject matter of pre-recorded audio video material[4] (the "Personal Viewing Information" or "PVI") without valid consent.[5]

12. Congress made clear that the harm to individuals impacted by VPPA violations occurs the moment, and each time, a subscriber's information is shared.

13. On the Website, because of NASCAR'S decision to employ the Pixel and because it chose to employ the Pixel on its video content on the

---

[3] 18 U.S.C. § 2710(a)(4).

[4] 18 U.S.C. § 2710(b)(2)(D)(II).

[5] 18 U.S.C. § 2710.

Website, a subscriber's PVI is shared *the moment* the subscriber requests video materials.[6]

14.    Defendant purposefully implemented and utilized the Pixel, which tracks user activity on the Website and discloses that information to Facebook to gather valuable marketing data.  The Pixel could not be placed on the Website without steps taken directly by or on behalf of Defendant (*see* Section C(a)). To be clear, the Pixel cannot be placed on a website by Facebook.  Only a website owner can place the Pixel on a website.  Here, the Pixel was utilized on the NASCAR Website, and effectuates the sharing of subscribers' PVI.  None of this could have occurred without purposeful action on the part of Defendant.

15.    Defendant does not seek and has not obtained consent from subscribers to utilize the Pixel to track, share, and exchange their PII and web watching data with Facebook.

16.    When a party, such as NASCAR, utilizes Facebook's Pixel, it is provided with details about its functionality, including the collection and

---

[6] As defined by the VPPA, protected "personally identifiable information" includes information which identifies a person as having "*requested* or obtained" video materials. *See* 18 U.S.C. § 2710(a)(3). When a website user clicks a link leading to a video, the user "requests" authorization to access the material from the website's server and, if authorized, the server then sends the data to the user. *See How the Web works*, MOZILLA https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited on August 2, 2023).

disclosure of its subscribers' PVI.[7]  In fact, it is made aware that one of the functions of the Pixel is to collect and share PVI to "use that information to provide measurement services[] [and] target and deliver ads. *Id.*

17.    Facebook also advises and directs website owners that there are notice and consent requirements associated with the use of the pixel in that website owners are responsible to provide that notice and obtain those consents. *See, infra,* ¶ 132.

18.    Not only did NASCAR know that its Website's subscribers' PVI would be shared, it was on notice of its notice and consent obligations.

19.    NASCAR cannot claim surprise as to the nature of the Pixel when Facebook itself warned NASCAR, aside from needing "a clear and prominent notice on each web page where [its] Pixels are used[,]" that NASCAR must "ensure, in a verifiable manner, that an end user provide[d] all necessary consents before [NASCAR] use[d] [Facebook's Pixel] to enable the storage of and access to Meta cookies . . . [i]n jurisdictions that require informed consent." *Id.*; *see, supra,* Section C(d).  Employing the Pixel on the Website resulted in users' PVI being shared (resulting in VPPA

---

[7]    *Meta Business Tools Terms*, FACEBOOK, https://www.facebook.com/legal/terms/businesstools ("You represent and warrant that you have provided robust and sufficiently prominent notice to users regarding the Business Tool Data collection, sharing and usage . . . Meta[] may use cookies web beacons and other storage technologies to collect or receive information from your websites . . . .") (last visited on August 2, 2023).

violations) with third parties. Defendant, despite its use of the Pixel, including on the pages of the Website containing pre-recorded video content, failed to obtain users' consent to allow the Pixel to operate in a way that shares users' protected information with Facebook.

20.    Subscribers of the Website have been harmed as a result of violations of the VPPA.  In addition to monetary damages, Plaintiffs seek injunctive relief requiring Defendant to immediately (i) remove the Pixel from the Website, or (ii) add adequate notices, and obtain the appropriate consent from, subscribers.[8]

21.    Plaintiffs' claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons.  Plaintiffs seek relief in this action individually and on behalf of subscribers of the Website for violations of the VPPA, 18 U.S.C. 2710.

---

[8] Website owners like NASCAR also have the option to anonymize the video's title within the URL or encrypt the video title using hashing, as described by Facebook. *See Meta for Developers:    Advanced    Matching*, FACEBOOK https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching#security (last visited August 2, 2023); *Meta Business Tools Terms*, FACEBOOK, https://www.facebook.com/legal/terms/businesstools ("When using a Meta image pixel or other Meta Business Tools, you or your service provider must hash [personally identifiable information] in a manner specified by us before transmission") (last visited on August 2, 2023).

## PARTIES

22.    Plaintiff Angela Myers lives at 2111 Brandywine Court, Lakeland, Florida, 33813.  Plaintiff Myers signed up for a NASCAR newsletter on or about 2022 using the email address O7babyface@aol.com. Plaintiff Myers became a subscriber to the NASCAR newsletter by providing her personal information, including, her name, email address, IP address (which informs Defendant as to the city and zip code she resides in as well as his physical location), and any cookies associated with her device. Plaintiff Myers used the Website for its intended purposes to access and view pre-recorded videos and news articles available to Plaintiff Myers through the Website. Plaintiff Myers used a Chrome internet browser on her laptop computer and other devices to view Defendant's video content, such as videos with NASCAR race highlights, racer interviews, and other video content. Plaintiff Myers cannot recall the names or titles of specific video content she viewed on the NASCAR website. Plaintiff Myers opened her Facebook account in approximately 2008. Upon information and belief, over the past several years, Plaintiff Myer's browser remained signed into her Facebook account when accessing and viewing video content on the Website.  Plaintiff Myers did not consent, agree, authorize, or otherwise permit Defendant to disclose her PVI to Facebook. Plaintiff Myers was not provided with written notice that Defendant discloses its subscribers' PVI, or any means of opting out of the

disclosures of their PVI. Still, NASCAR knowingly disclosed Plaintiff Myers PVI to Facebook. During the course of Plaintiff Myers' subscription to the newsletter, which included links to content on the Website, Defendant collected and shared PVI with Facebook each and every time one of the Pixel Events occurred. Defendant has violated Plaintiff Myers' right to privacy under the VPPA.

23.    Plaintiff Oscar Rodriguez lives at 5281 Plantation Home Way, Port Orange, Florida, 32128.  Plaintiff Rodriguez signed up for a NASCAR newsletter on or about 2022 using the email address orod3@aol.com. Plaintiff Rodriguez became a subscriber to the NASCAR newsletter by providing his personal information, including, his name, email address, IP address (which informs Defendant as to the city and zip code he resides in as well as his physical location), and any cookies associated with his device. Plaintiff Rodriguez used the Website for its intended purposes to access and view pre-recorded videos and news articles available to Plaintiff Rodriguez through the Website. Plaintiff Rodriguez used a Chrome internet browser on his laptop computer and other devices to view Defendant's video content, such as videos related to NASCAR including highlight videos on the 2023 Daytona 500 and Sanoma NASCAR races, among other video content. Plaintiff Rodriguez opened his Facebook account in approximately 2008. Upon information and belief, over the past several years, Plaintiff

Rodriguez's browser remained signed into his Facebook account when accessing and viewing video content on the Website. Plaintiff Rodriguez did not consent, agree, authorize, or otherwise permit Defendant to disclose his PVI to Facebook. Plaintiff Rodriguez was not provided with written notice that Defendant discloses its subscribers' PVI, or any means of opting out of the disclosures of their PVI. Still, NASCAR knowingly disclosed Plaintiff Rodriguez's PVI to Facebook. During the course of Plaintiff Rodriguez's subscription to the newsletter, which included links to content on the Website, Defendant collected and shared PVI with Facebook each and every time one of the Pixel Events occurred. Defendant has violated Plaintiff Rodriguez's right to privacy under the VPPA.

24.    Plaintiff Paul Sutton lives at 275 Majesty Rd Apt 203, Concord, North Carolina, 28027. Plaintiff Sutton signed up for a NASCAR newsletter on or about 2015 using the email address paulsuton@gmail.com. Plaintiff Sutton became a subscriber to the NASCAR newsletter by providing his personal information, including, his name, email address, IP address (which informs Defendant as to the city and zip code he resides in as well as his physical location), and any cookies associated with his device. Plaintiff Sutton used the Website for its intended purposes to access and view pre-recorded videos and news articles available to Plaintiff Sutton through the Website. Plaintiff Sutton used a Chrome internet browser on his laptop

computer and other devices to view Defendant's video content, such as videos related to NASCAR including highlight videos and specifically a video titled "Josh Berry to drive No. 4 Ford for Steward-Haas Racing in 2024," along with  other video content. Plaintiff Sutton opened his Facebook account in approximately 2008. Upon information and belief, over the past several years, Plaintiff Sutton's browser remained signed into his Facebook account when accessing and viewing video content on the Website.  Plaintiff Sutton did not consent, agree, authorize, or otherwise permit Defendant to disclose his PVI to Facebook. Plaintiff Sutton was not provided with written notice that Defendant discloses its subscribers' PVI, or any means of opting out of the disclosures of their PVI. Still, NASCAR knowingly disclosed Plaintiff Sutton's PVI to Facebook. During the course of Plaintiff Sutton's subscription to the newsletter, which included links to content on the Website, Defendant collected and shared PVI with Facebook each and every time one of the Pixel Events occurred. Defendant has violated Plaintiff Sutton's right to privacy under the VPPA.

25.    Plaintiff Trevor Adkins lives at 814 Boatlanding Rd., Bowling Green, Kentucky, 46101.  Plaintiff Adkins signed up for a NASCAR newsletter on or about 2021 using the email tadkins4200@gmail.com. Plaintiff Adkins became a subscriber to the NASCAR newsletter by providing his personal information, including his name, email address, IP address (which informs

Defendant as to the city and zip code he resides in as well as his physical location), and any cookies associated with his device. Plaintiff Adkins used the Website for its intended purposes to access and view pre-recorded videos and news articles available to Plaintiff Adkins through the Website. Plaintiff Adkins used a Chrome internet browser on his laptop computer and other devices to view Defendant's video content, specifically Plaintiff Adkins recalls watching a video regarding an on-track dispute between Kyle Larson and Dany Hamlin and highlights of the 2023 Pocono NASCAR race on the NASCAR Website, among other video content. Plaintiff Adkins opened his Facebook account in approximately 2009. Upon information and belief, over the past several years, Plaintiff Adkins' browser remained signed into his Facebook account when accessing and viewing video content on the Website. Plaintiff Adkins did not consent, agree, authorize, or otherwise permit Defendant to disclose his PVI to Facebook. Plaintiff Adkins was not provided with written notice that Defendant discloses its subscribers' PVI, or any means of opting out of the disclosures of their PVI. Still, NASCAR knowingly disclosed Plaintiff Emmons' PVI to Facebook. During the course of Plaintiff Adkins subscription to the newsletter, which included links to content on the Website, Defendant collected and shared PVI with Facebook each and every time one of the Pixel Events occurred. Defendant has violated Plaintiff Adkins' right to privacy under the VPPA.

26.    Plaintiff Brent Rish lives at 79 Bemis Rd., Hubbardston, Massachusetts 01452. Plaintiff Rish signed up for a NASCAR newsletter on or about 2017 using the email address brent.rish@gmail.com. Plaintiff Rish became a subscriber to the NASCAR newsletter by providing his personal information, including, his name, email address, IP address (which informs Defendant as to the city and zip code he resides in as well as his physical location), and any cookies associated with his device. Plaintiff Rish used the Website for its intended purposes to access and view pre-recorded videos and news articles available to Plaintiff Rish through the Website. Plaintiff Rish used a Chrome internet browser on his laptop computer and other devices to view Defendant's video content, such as highlights and recaps on the Pocono race of 2023 on the NASCAR Website, among other video content. Plaintiff Rish opened his Facebook account in approximately 2009. Upon information and belief, over the past several years, Plaintiff Rish's browser remained signed into his Facebook account when accessing and viewing video content on the Website. Plaintiff Rish did not consent, agree, authorize, or otherwise permit Defendant to disclose his PVI to Facebook. Plaintiff Rish was not provided with written notice that Defendant discloses its subscribers' PVI, or any means of opting out of the disclosures of their PVI. Still, NASCAR knowingly disclosed Plaintiff Rish's PVI to Facebook. During the course of Plaintiff Rish's subscription to the newsletter, which

included links to content on the Website, Defendant collected and shared PVI with Facebook each and every time one of the Pixel Events occurred. Defendant has violated Plaintiff Rish's right to privacy under the VPPA.

27.    Plaintiff Derek Sammelman lives at 525 White Fence Dr., Wentzville, Missouri, 63385. Plaintiff Sammelman signed up for a NASCAR newsletter on or about 2019 using the email address dsamm@icloud.com. Plaintiff Sammelman became a subscriber to the NASCAR newsletter by providing his personal information, including, his name, email address, IP address (which informs Defendant as to the city and zip code he resides in as well as his physical location), and any cookies associated with his device. Plaintiff Sammelman used the Website for its intended purposes to access and view pre-recorded videos and news articles available to Plaintiff Sammelman through the Website. Plaintiff Sammelman used a Safari internet browser on his laptop computer and other devices to view Defendant's video content, specifically highlights of the Talladega Superspeedway race and the Kansas Speedway 2023 races, among other video content. Plaintiff Sammelman opened his Facebook account in approximately 2009. Upon information and belief, over the past several years, Plaintiff Sammelman's browser remained signed into his Facebook account when accessing and viewing video content on the Website. Plaintiff Sammelman did not consent, agree, authorize, or otherwise permit

Defendant to disclose his PVI to Facebook. Plaintiff Sammelman was not provided with written notice that Defendant discloses its subscribers' PVI, or any means of opting out of the disclosures of their PVI. Still, NASCAR knowingly disclosed Plaintiff Sammelman's PVI to Facebook. During the course of Plaintiff Sammelman's subscription to the newsletter, which included links to content on the Website, Defendant collected and shared PVI with Facebook each and every time one of the Pixel Events occurred. Defendant has violated Plaintiff Sammelman's right to privacy under the VPPA.

28.    Plaintiff Mary Martin lives at 947 E Princeton Avenue apt 102, Fresno, California 93704.  Plaintiff Martin signed up for a NASCAR newsletter on or about 2008 using the email address kanonlybeme@gmail.com. Plaintiff Martin became a subscriber to the NASCAR newsletter by providing her personal information, including, her name, email address, IP address (which informs Defendant as to the city and zip code she resides in as well as his physical location), and any cookies associated with her device. Plaintiff Martin used the Website for its intended purposes to access and view pre-recorded videos and news articles available to Plaintiff Martin through the Website. Plaintiff Martin used a Safari internet browser on her laptop computer and other devices to view Defendant's video content, including NASCAR race highlights and racer

interviews among other video content. Plaintiff Martin cannot recall the names or titles of specific video content she viewed on the NASCAR Website. Plaintiff Martin opened her Facebook account in approximately 2009. Upon information and belief, over the past several years, Plaintiff Martin browser remained signed into her Facebook account when accessing and viewing video content on the Website. Plaintiff Martin did not consent, agree, authorize, or otherwise permit Defendant to disclose his PVI to Facebook. Plaintiff Martin was not provided with written notice that Defendant discloses its subscribers' PVI, or any means of opting out of the disclosures of their PVI. Still, NASCAR knowingly disclosed Plaintiff Martin's PVI to Facebook. During the course of Plaintiff Martin's subscription to the newsletter, which included links to content on the Website, Defendant collected and shared PVI with Facebook each and every time one of the Pixel Events occurred. Defendant has violated Plaintiff Martin's right to privacy under the VPPA.

29.    Defendant NASCAR is an American auto racing sanctioning and operating company with headquarters at 1 Daytona Blvd, Daytona Beach, Florida 32114. NASCAR is considered one of the top ranked motorsport organizations globally, and is one of the top spectator sports in the United States. NASCAR oversees various racing series, including the NASCAR Cup Series, where drivers compete for the season-long championship. With a

rich history and iconic race events, NASCAR is a driving force in motorsport racing industry.

30.    Defendant NASCAR Media Group, LLC (NMG) is formed in Florida, with NASCAR Holdings LLC as a member, with offices and studios located in Charlotte, North Carolina.  NMG, on its own and working with media partners, creates, edits, and distributes NASCAR-related audio visual content, including clips, news shows, podcasts, radio broadcasts, interviews, and creative content.  is a "state-of-the-art production" organization, with production facilities including recording studios, both audio and visual, data storage and archiving to house NASCAR audio visual content, live and pre-recorded editing suites, and digital distribution infrastructure.[9]

31.    Defendant NASCAR Digital Media, LLC (NDM) was formed in Florida and is headquartered in North Carolina, with NMG as a member. NDM manages NASCAR's digital presence through websites, mobile apps, the official NASCAR YouTube channel, and the official fantasy league.[10]

## **JURISDICTION AND VENUE**

32.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members; the

---

[9] *Behind The Scenes Tour NASCAR Racing Media Group Facility*, YOUTUBE https://www.youtube.com/watch?v=WWpmsWOstHI (last visited August 2, 2023).
[10]    *NDM    Advertising    Footer*,    NASCAR    https://www.nascar.com/wp-content/uploads/sites/7/2020/01/2020-NDM-Advertising_Footer-Doc.pdf (last visited August 2, 2023).

aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class Member is a citizen of a state different from at least one Defendant.

33.    This Court has personal jurisdiction over Defendant NASCAR because Defendant NASCAR's principal place of business is in Florida, and NASCAR derives revenue in the State of Florida, including Defendant NDM's revenue generation from its management over the Website, including as well as the revenue sharing, advertising sales, etc., that Defendant derives from the Website.

34.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant NASCAR's principal place of business is located in this District and both NASCAR and NDM conduct substantial business operations in this District. In connection with the Website, the video content, hosting of media accessible to subscribers, and associated coding, all originate and arise out of the Defendant's business operations in this District.

## **COMMON FACTUAL ALLEGATIONS**

**A.    Legislative Background**

**a.    The Video Privacy Protection Act**

35.    "The Video Privacy Protection Act follows a long line of statutes passed by the congress to extend privacy protection to records that contain

information about individuals." S. Rep. No. 100-599 at 2 (1988). Starting with the Fair Credit Reporting Act of 1970, Congress sought to protect the "confidentiality of personal information" and passed multiple laws that "expanded and [gave] meaning to the right of privacy." *Id.*

36.    In 1977, Congress amended the Privacy Act, which mandated the creation of the Privacy Protection Study Commission ("the Commission"), which studied "'data banks, automated data processing programs, and information systems of governmental, regional, and private organizations, in order to determine the standards and procedures in force for the protection of personal information.'" *Id.* (quoting 95-38). The Commission concluded that an effective national information policy must: (i) minimize intrusiveness; (ii) maximize fairness; and (iii) create legitimate, enforceable expectations of confidentiality. *Id.* "As a general rule, the Commission recommended that organizations which maintained a confidential records system be placed under a legal duty not to disclose the record without the consent of the individual, except in certain limited circumstances. . . ." *Id.* at 2-3.

37.    In 1988, Congress was again forced to act when a Washington-based newspaper published a profile of Judge Robert H. Bork "based on the titles of 146 films his family had rented from a video store." *Id.* at 5.

Senators took to the floor to denounce the act, with Senator Patrick Leahy noting that:

> In an era of interactive television cables, the growth of computer checking and check-out counters . . . all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch . . . I think it is something that we have to guard against.

*Id.* at 5-6.

38.    Congress believed that these "information pools" created privacy interests that directly affected the ability of people to freely express their opinions, join in association with others, or enjoy the general freedoms and independence protected by the Constitution.  *Id.* at 7.

39.    As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance."  *Id.* at 7–8 (statements of Sens. Simon and Leahy, respectively).

40.    Senator Simon lamented that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." *Id.* at 6–7.

41.    As a result, Senate Bill 2361 was drafted to "give meaning to, and thus enhance, the concept of privacy for individuals in their daily lives" by

prohibiting "unauthorized disclosures of personal information held by video tape providers." *Id.* at 6.

42.    When contemplating the VPPA, Congress noted Supreme Court precedent recognizing a privacy right in the lists that reveal personal beliefs and an individual's choice of books and films. *Id.* at 4.

43.    The VPPA regulates the disclosure of information about consumers' consumption of video content, imposing specific requirements to obtain consumers' consent to such disclosure. Under the statute, for each violation of the statute, a court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and attorney's fees.

44.    The statutory damages were deemed "necessary to remedy the intangible harm caused by privacy intrusions." *Id.* at 8.

45.    The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1).

46.    Consumer is defined as "any renter, purchaser, or subscriber of goods or services from a video tape service provider[.]" 18 U.S.C. § 2710(a)(1).  The plain language of the definition of consumer appears first among the subsections of the VPPA, and uses broad language to define what a consumer is.

47.    The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). Here, Congress made special note that:

> The definition of personally identifiable information includes the term "video" to make clear that simply because a business is engaged in the sale or rental of video materials or services does not mean that all of its products or services are within the scope of the bill. For example, a department store that sells video tapes would be required to extend privacy protection to only those transactions involving the purchase of video tapes and not other products. **This definition makes clear that personally identifiable information is intended to be transaction-oriented. It is information that identifies a particular person as having engaged in a specific transaction with a video tape service provider.** The bill does not restrict the disclosure of information other than personally identifiable information.

Senate Report 100-599, at 12 (1988)

48.    Congress wanted to ensure that any transaction between consumer and VTSP involving a request or procurement of specific video materials or video services would be protected.  In short, the language is broad enough to encompass digital as well as physical transactions, so long as the transaction includes the defined and prohibited information.

49.    A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

23

50.    While 18 U.S.C. § 2710(a)(3) limits PII to information identifying a person as having requested "specific video materials or services" and 18 U.S.C. § 2710(a)(4) limits VTSP to a person in the business of renting, selling, or delivering prerecorded audio visual materials, affected consumers are not limited by any such link to "video *materials*" or "audio visual *materials.*" Instead, consumer applies to "*goods* or services" from a VTSP generally.

51.    The wide scope of consumer comports with the initial purpose of the VPPA, which was initially passed in 1988 for the purpose of protecting the privacy of individuals' video rental, purchase, and viewing data.

52.    In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

53.    During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy stated that "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,'

mobile apps and other new technologies have revolutionized the availability of Americans' information."[11]

54.    This application of the VPPA to modern video sources, such as websites, has been confirmed by various courts across the country.[12]

55.    Defendant here is video service provider as they provided pre-recorded audio-visual materials to Plaintiffs and Class Members on their Website.

56.    The relationship between Plaintiffs and Defendant is precisely the type of relationship contemplated by the VPPA.

57.    In this case, Plaintiffs' personal viewing information was knowingly and systematically disclosed to Facebook, without obtaining their consent.

---

[11] See *Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*, SENATE JUDICIARY COMMITTEE SUBCOMMITTEE ON PRIVACY, TECHNOLOGY AND THE LAW, *available at* https://www.judiciary.senate.gov/download/hearing-transcript_-the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century (last visited on August 2, 2023).

[12] *See, e.g., Sellers v. Bleacher Report, Inc.,* 2023 U.S. Dist. LEXIS 131579, at *15–18 (N.D. Cal. July 29, 2023) (VPPA sufficiently applied to sports news website); *Jackson v. Fandom, Inc.,* 2023 U.S. Dist. LEXIS 125531, at *6 (N.D. Cal. July 20, 2023) (VPPA applies to gaming and entertainment website); *Louth v. NFL*, 2022 U.S. Dist. LEXIS 163706, at *11–12 (D.R.I. Sep. 12, 2022) (holding VPPA applied to NFL's videos accessible through mobile app).

**B.  NASCAR's Digital Media Background**

58.    NASCAR is the sanctioning body for the No. 1 form of motorsports in the United States.[13]

59.    NASCAR consists of three national racing series, four regional series, one local grassroots series, and three international series.[14]

60.    These racing series result in NASCAR sanctioning more than 1,200 races across the United States, Canada, Mexico, and Europe.[15]

61.    As NASCAR's Tim Clark, senior vice president and Chief Digital Officer, notes, not all fans can physically watch a race, "so, specifically on the digital side, we've tried to create a lot of those experience that could be the next best thing."[16]

62.    "Our users really want a race experience on multiple devices. You know, they really want to see what they see at a race track, and hear what they hear at the race track, and give the fans a great experience on phones, on desktop, and on connected devices. Obviously, monetizing across all

---

[13]  *What is NASCAR? Start Your Engines*, NASCAR KIDS https://www.nascarkids.com/what-is-nascar/ (last visited August 2, 2023).
[14] *Id.*
[15] *Id.*
[16] *Ad Manager: NASCAR Digital monetizes across screens with Dynamic Ad Insertion*, GOOGLE    https://admanager.google.com/home/success-stories/nascar-digital-across-screen-dynamic-ad-insertion/ (last visited August 2, 2023).

screens is very important."  Brendan Reilly, NASCAR's Director of Revenue Operations.[17]

63.    To monetize these races, among things, NASCAR sells the rights to broadcast races themselves,[18] and created its own digital media operation or venture with, among other digital revenue streams, digital advertising.[19]

64.    To provide content for its digital media presence, NASCAR produces much of its own audio visual media content, under NASCAR Media Group ("NMG") and its various branches.

65.    NASCAR's NMG is a "state-of-the-art production" organization, with media production facilities including recording studios (both audio and visual), data storage and archiving to house NASCAR audio visual content, live and pre-recorded editing suites, and digital distribution infrastructure.[20]

---

[17] *Id.*

[18] *See NASCAR looking at streaming option in next media deal; FOX, NBC expected to renew TV rights,* JAYSKI  https://www.jayski.com/2023/05/02/nascar-looking-at-streaming-option-in-next-media-deal-fox-nbc-expected-to-renew-tv-rights/ (last visited August 2, 2023).

[19] *NASCAR Digital Media Adds Five Executives To Team,* SPEEDWAY DIGEST https://speedwaydigest.com/index.php/news/racing-news/5883-nascar-digital-media-adds-five-executives-to-team ("Earlier this year, NASCAR announced that it will assume business and editorial control of its interactive, digital and social media rights including technical operations and infrastructure of all NASCAR digital platforms including NASCAR.com starting in January 2013") (last visited August 2, 2023); *Ad Manager: NASCAR Digital monetizes across screens with Dynamic Ad Insertion,* GOOGLE https://admanager.google.com/home/success-stories/nascar-digital-across-screen-dynamic-ad-insertion/ (last visited August 2, 2023).

[20] *Behind The Scenes Tour NASCAR Racing Media Group Facility,* YOUTUBE https://www.youtube.com/watch?v=WWpmsWOstHI (last visited August 2, 2023).

66.    NMG's production team occupies a large portion of NASCAR Plaza in Charlotte North Carolina, and is scheduled to expand to "a new state-of-the-art facility in Concord" which includes a 58,000-square foot studio and "will house 125 NASCAR Productions and Motor Racing Network employees with room to expand further in the future."[21]

67.    This expansion was prompted in part because "NASCAR Productions business has fundamentally changed in recent years, with NASCAR's live event production operation more than doubling since 2018."[22]

68.    Brian Herbst, NASCAR's Senior Vice President of Media and Productions said that "live production and investing in technology that enhances the fan viewing experience has never been more important – it's essential that our new workspace can facilitate that strategic growth."[23]

69.    A stated purpose of the NMG's "library" is to "preserve and protect the visual and audio history of [the] sport."[24]  And, "[e]very piece of

---

[21] Hank Lee, *NASCAR Productions moving to Concord from Uptown Charlotte*, WCNC Charlotte (Aug. 10, 2022) https://www.wcnc.com/article/sports/motor/nascar/nascar-productions-concord-north-carolina-facility-cabarrus-county-relocation/275-ca5bcb4d-fade-46a8-9401-00d7e3e3a2dd (last visited August 2, 2023).
[22] *Id.*
[23] *Id.*
[24] Hank Lee, *NASCAR Productions moving to Concord from Uptown Charlotte*, WCNC Charlotte (Aug. 10, 2022) https://www.youtube.com/watch?v=WWpmsWOstHI (at 5:25) (last visited August 2, 2023).

footage that comes into or out of the NASCAR Media Group facility goes through the library."[25]

70.    This archived footage is then logged with "metadata" that allows producers to search through and utilize stored video for current media project needs.[26]

71.    This digital media is then distributed across multiple channels, such as broadcast and satellites.[27]

72.    One such destination for the NMG's digital media is NASCAR's own website.

73.    In 2012, NASCAR announced that it would handle its NASCAR Website in-house under the management of its subsidiary, NASCAR Digital Media.[28]  To that end, NDM staffed its company with executives that had experience in broadcast, digital media, digital advertising, and video production.[29]

74.    NDM, a Florida LLC which lists NMG as its managing member,[30]

---

[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *NASCAR Digital Media Adds Five Executives To Team*, SPEEDWAY DIGEST https://speedwaydigest.com/index.php/news/racing-news/5883-nascar-digital-media-adds-five-executives-to-team (last visited August 2, 2023).
[29] *Id.*
[30] *NASCAR Digital Media, LLC*, SUNBIZ.ORG https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=Initial&searchNameOrder=NASCARDIGITALMEDIA%2oL110001414860&aggregateId=flal-l11000141486-7839d3cd-5505-40e2-b0ea-

is directly linked, through the naming scheme used to identify the videos, to the videos on the Website.[31]

75.    By 2018, NDM was not merely managing and delivering audio visual content to digital platforms, it was also designing connected websites for tracks, racing teams, and NASCAR's own content platform.[32]

## C.    The Website Utilizes the Facebook Pixel to Gather and Transmit PII and Video Watching Data

76.    Facebook offers the Pixel to web developers for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.  *See infra* ¶ 17.

77.    The Pixel is a marketing tool that can only be added to a webpage by website developers.  A website operator must sign up for a business account or link a related Facebook account with its Pixel, and then add code to the website to make use of the Pixel.[33]

78.    As Facebook notes, the Pixel was added to each individual page

---

99722c824f27&searchTerm=nascar%20digital&listNameOrder=NASCARDIGITALENT ERTAINMENT%20A990000012721 (last visited August 2, 2023).

[31] *See XML Sitemap,* NASCAR https://www.nascar.com/sitemap_index.xml (last visited August 2, 2023) (the video sitemaps refer to NDM).

[32] *Inside the Growth of NASCAR Digital Media,* FRONT OFFICE SPORTS https://frontofficesports.com/inside-the-growth-of-nascar-digital-media/ (last visited August 2, 2023).

[33] *Business Help Center: How to set up and install a Meta Pixel,* FACEBOOK, *available at* https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited on August 2, 2023).

that NASCAR wished to be tracked.[34]

79.    Defendant must have effectuated these steps to add the Pixel to the Website.

80.    The Pixel is employed by NASCAR to gather, collect, and then share user information with Facebook.[35]  Receiving this information enables Facebook and the web developers to build valuable personal profiles for users, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[36]  The sharing of subscribers' PVI benefits NASCAR by improving the effectiveness of advertising targeted at NASCAR's subscribers.  As NASCAR's Brendan Reiley, Director of Revenue Operations, admits, targeted and dynamic digital advertising used across NASCAR's digital platforms increased advertising inventory sales by 90% and increase programmatic fill by at least 300%.[37]

81.    Website owners and operators can choose to use the Pixel to

---

[34]    *Meta    for    Developers:    Get    Started*, FACEBOOK https://developers.facebook.com/docs/meta-pixel/get-started/ ("To install the Pixel, add its base code . . . on every page where you will be tracking website visitor actions") (last visited on August 2, 2023).

[35] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta    for    Developers:    Meta    Pixel*, FACEBOOK, https://developers.facebook.com/docs/meta-pixel/ (last visited on August 2, 2023).

[36] *See Meta Pixel*, FACEBOOK, https://www.facebook.com/business/tools/meta-pixel (last visited on August 2, 2023).

[37] *Ad Manager: NASCAR Digital monetizes across screens with Dynamic Ad Insertion*, GOOGLE https://admanager.google.com/home/success-stories/nascar-digital-across-screen-dynamic-ad-insertion/ (last visited August 2, 2023).

share both user activity (including video watching activity) and user identity with Facebook.  Here, the NASCAR Website shares both.

82.   The harvested data can improve NASCAR's advertising by pinpointing audience demographics by age, gender, relationship status, education, employment title, geographic region, and interests.[38]

83.   The PVI provides similar, if not more, data, including which drivers, racing teams, racing tracks, or racing cups subscribers follow, in addition to their Facebook profile data.

84.   The owner or operator of a website holds the decision-making authority over the placement of the Pixel on its site, as well as whether or not any of the data within the Pixel transmission should be "hashed" (a form of encryption).

### a.    The NASCAR Website Implemented the Pixel

85.   To activate and employ a Facebook Pixel, a website owner must first sign up for a Facebook account, where specific "business manager" accounts are provided the most utility for using the Pixel.[39]  For instance, business manager accounts can: (i) create and utilize more simultaneous Pixels, (ii) manage multiple Facebook Ad Accounts and Pages from a

---

[38] *How To Target Facebook Ads To "NASCAR" Audience*, ADTARGETING https://adtargeting.io/facebook-ad-targeting/nascar (last visited August 2, 2023).
[39] *Business Help Center: How to create a Meta Pixel in Business Manager*, FACEBOOK, https://www.facebook.com/business/help/314143995668266?id=1205376682832142 (last visited on August 2, 2023).

centralized interface, (iii) access and manage multiple parties (which can then be given specific levels of access, including more easily revoking access to ex-employees), (iv) build custom audiences for multiple ad campaigns, and (v) eliminate privacy concerns related to using a personal profile for business purposes.[40]

86.     To add an operational Pixel to a website, the website owner or operator must take several affirmative steps, including naming the Pixel during the creation and setup of the Pixel.[41]

87.     Once the Pixel is created, the website operator assigns access to the Pixel to specific people for management purposes,[42] and must connect the Pixel to a Facebook Ad account.[43]

88.     To add the Pixel to its website, the website operator can choose to add the Pixel code through the "event setup tool" via "partner integration" or by manually adding the code to the website.

---

[40] Jacqueline Zote, *A step-by-step guide on how to use Facebook Business Manager* (June 14, 2021), SPROUTSOCIAL, https://sproutsocial.com/insights/facebook-business-manager/ (last visited on August 2, 2023).

[41] *Id.; see also* Ivan Mana, *How to Set Up & Install the Facebook Pixel (In 2022)*, YOUTUBE, *available at* https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited August 2, 2023).

[42] *Business Help Center: Add People to Your Meta Pixel in Your Meta Business Manager*, FACEBOOK https://www.facebook.com/business/help/279059996069252?id=2042840805783715 (last visited on August 2, 2023).

[43] *Business Help Center: Add an ad account to a Meta Pixel in Meta Business Manager*, FACEBOOK, https://www.facebook.com/business/help/622772416185967 (last visited on August 2, 2023).

89.    Manually adding base Pixel code to the website consists of a multi-step process, which includes: (i) creating the pixel; (ii) installing base code in the header of every webpage the Pixel is active, (iii) setting automatic advanced matching behavior, (iv) adding event code using an automated tool or manually,[44] (v) domain verification, and (vi) configuring web events.[45]

90.    After following these steps, a website operator can start capturing and sharing information using the Pixel.

91.    A Pixel cannot be placed on a website by a third-party.  It must be placed directly by or on behalf of the site owner.

92.    Once the Pixel is set and activated, it can begin collecting and sharing user activity data as instructed by the website owner.

93.    When a Facebook user logs onto Facebook, a "c_user" cookie – which contains a user's non-encrypted Facebook User ID number ("UID") – is automatically created and stored on the user's device for up to a year.[46]

---

[44] Some users claim that automated tools for adding event code provide inconsistent results and recommend adding event code manually.  *See* Ivan Mana, *How to Set Up & Install the Facebook Pixel (In 2022)*, YOUTUBE, https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited on August 2, 2023).

[45] *Business Help Center: How to set up and install a Meta Pixel*, FACEBOOK https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited on August 2, 2023); *see* Ivan Mana, *How to Set Up & Install the Facebook Pixel (in 2022)*, YOUTUBE  https://www.youtube.com/watch?v=ynTNs5FAUm8  (last visited on August 2, 2023).

[46] *Privacy Center: Cookies & other storage technologies*, FACEBOOK https://www.facebook.com/policy/cookies/ (last visited on August 2, 2023).

94.     This means that for subscribers to the Website's newsletters who are also Facebook users, their PVI is certain to be shared.  Their PII is automatically bundled with their web watching history and disclosed to Facebook when visiting a page with an active Pixel, including the home page.

95.     While the process to determine what information is being collected by the Pixel from a user's is admittedly complicated, the recipient of the Pixel's transmissions receives the information in a clear and easy to understand manner.

96.     The seemingly complex data, such as the long URLs included in the Pixel's transmission, is "parsed," or translated into an easier to read format, such that the information is legible.

97.     For example, an embedded URL in a Pixel HTTP Request may look like an indecipherable code, as depicted below:



*Figure 2 - Sample Pixel Request URL*

98.     However, these URLs are designed to be "parsed" into easy-to-digest pieces of information, as depicted below:



*Figure 3 - Parsed URL Information from Sample Pixel Request*

99.    Similarly, the cookies attached to the Pixel's transmissions appear as a dense, albeit much less so, wall of text, as depicted below:



*Figure 4 - Cookie Data from Sample Pixel Request*

100.   However, like the URL data, the cookie data is easily parsed into more digestible format, as depicted below:



*Figure 5 - Parsed Cookie Data from Sample Pixel Request*

101.   As such, PVI can be used by anyone who receives the Pixel transmission, to easily identify a Facebook user.

102.   Any person, even without in-depth technical expertise, can utilize the UID to identify owners of the UID via their Facebook profile. Once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual of ordinary skill and technical proficiency to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]).  That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

### b.    The Pixel as a Tracking Tool

103.  The Pixel tracks user-activity on web pages by monitoring events,[47] which when triggered, causes the Pixel to automatically send data – here, subscribers' PVI – directly to Facebook.[48]

104.  Examples of events utilized by websites include: a user loading a page with (i) "microdata" tags (the "Microdata event"),[49] or (ii) with a Pixel installed (the "PageView event").[50]  The NASCAR Website utilizes both.[51]

105.  When a PageView and/or Microdata event is triggered, a "HTTP Request" is sent to Facebook (through Facebook's URL www.facebook.com/tr/).[52]  This confirms that the Pixel events sent data to Facebook.

---

[47]  *Business Help Center: About Meta Pixel*, FACEBOOK https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited on August 2, 2023).

[48]  *See generally Id.*

[49]  *Facebook Microdata Installing Schema*, CAT HOWELL, *available at* https://cathowell.com/facebook-microdata-what-it-is-how-to-set-it-up/ (last visited on August 2, 2023).

[50]  *Business Help Center: Specifications for Meta Pixel standard events*, FACEBOOK https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited on August 2, 2023).

[51]  The presence of Pixel events, such as the Microdata and PageView events, can be confirmed by using the publicly available and free Meta Pixel Helper tool.  *See Business Help Center: About the Meta Pixel Helper*, FACEBOOK https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited on August 2, 2023).

[52] *How We Built a Meta Pixel Inspector*, THE MARKUP https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector (last visited on August 2, 2023).

106. The HTTP Request includes a Request URL and embedded cookies such as the c_user cookie.  It may also include information in its Payload,[53] such as metadata tags.

107. A Request URL, in addition to a domain name and path, contains parameters.  Parameters are values added to a URL to transmit data and direct a web server to provide additional context-sensitive services, as depicted below:



*Figure 6 – Mozilla's diagram of a URL, including parameters[54]*

### c. The Pixel Shares and Subscribers' PII and Video Watching Data

108. Defendant uses the Pixel as a tracking method to collect and share Website subscribers' PVI with Facebook. Defendant does not disclose its data sharing practices or obtain permission from its subscribers to share their PVI with Facebook.

109. Defendant shares non-anonymized, PII and web watching history containing video titles with Facebook. Defendant's disclosures

---

[53] The "request payload" (or more simply, "Payload") is data sent by a HTTP Request, normally through a POST or PUT request, where the HTTP Request has a distinct message body.  Payloads typically transmit form data, image data, and programming data. *See* *Request Payload Verification,* SITESPECT https://doc.sitespect.com/knowledge/request-payload-trigger (last visited August 2, 2023).

[54] *What is a URL?,* MOZILLA https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited on August 2, 2023).

include unique identifiers (the FID) that correspond to specific Facebook users. The recipient of the PVI finds the PII and web watching packaged together in a single data transmission which is easily readable by an ordinary person once the PVI is packaged and delivered by the Website's tracking tools. Defendant monetizes its Website's newsletter subscribers by disclosing subscribers' PVI to Facebook in a format which allows it to make a direct connection between the identity of its subscriber and that subscribers' PVI, without the consent of its subscribers and to the detriment of Plaintiffs' and class members' legally protected privacy rights.

110.   Defendant had and continues to have the choice to design the Website so that the webpage URLs did not include the titles of videos. Defendant had, and has, the choice as to whether to purposefully include more information in the Website's URLs, including to improve website interaction and search engine optimization.[55]   Here, NASCAR chose to expose subscribers' video information so that it could benefit from the tracking and sharing of subscribers' PVI.

---

[55] *See Domains,* MOZ https://moz.com/learn/seo/domain (last visited August 2, 2023).

111.    Defendant also had the power to implement the Pixel in a way that shielded subscribers' sensitive information. NASCAR chose, however, to transmit subscribers' unencrypted PVI.[56]

112.    These factual allegations are corroborated by publicly available evidence. For instance, a subscriber visits the NASCAR site, clicks on a pre-recorded video, such as "Jessica Hook details challenges of turning Next Gen car into Garage 56 entry," and subsequently watches the video.

113.    Sensitive data sent to Facebook through the triggered Facebook Pixel Events are included within the parameters of the Request URL, within the Request Header, or as a Payload within the request. The specific Pixel Events implemented by NASCAR sends subscribers' PVI through the Request URL parameters and HTTP Headers.[57]

114.    An "HTTP Header" is a field of an HTTP request or response that passes additional context and metadata about the request or response.[58] Specifically, Request Headers are a subset of HTTP Headers that are used to provide information about a request's context, so that a server can customize

---

[56] *See Meta for Developers: Advanced Matching*, FACEBOOK https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching (last visited August 2, 2023).

[57] URL parameters are values that are added to a URL to cause a web server to provide additional or different services. *What is a URL?,* MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited August 2, 2023).

[58] *HTTP header*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/HTTP_header (last visited August 2, 2023).

its response to the request or supply authentication credentials[59] to the server or otherwise provide more information about the client sending the request.[60]

115.    Defendant shares with Facebook the specific Streaming Content requested by subscribers to the Website through Request URL parameters. This is portrayed in *Figure 7 below*.



*Figure 7, Video Title included in URL parameters disclosed to Facebook through PageView Pixel Event on the Website*

116.    Defendant also transmits subscribers' PII to Facebook in the form of an unencrypted and unique Facebook ID number contained in the

---

[59] *Id.*
[60] *Id.*

c_user cookie included in the HTTP Request Header, which can be used to find a user's personal Facebook page, as highlighted in *Figure 7* above.

117.   The information contained within the c_user cookie is considered PII. It contains "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior."[61]   Because the Facebook ID number can simply and easily be appended to "www.facebook.com/" to navigate to the relevant user's profile, it requires no special skill or expertise to identify the user associated with the Facebook ID, and courts have regularly upheld its status as PII.[62]

118.   By way of example, the following includes a pixel transmission with a c_user cookie:



Cookie:    sb=0r5TYP8LbS_cSfNNh1471Jbm; datr=075TYMp9Ab0I3w9zFNwy6r6X; c_user=100091959850832; usida=eyJ2ZXIiOjEsImIkIjoiQXJ5b3lybzE4Z2J2ZHMiLCJ0aW1lIjoxNjkwODUwMDUwfQ%3D%3D; xs=47%3AKKyLXdIOfDAkyA%3A2%3A1681934240%3A-1%3A-1%3A%3AAcUntX_TAxYe59eQ67JyMlI77ylsQfvyB9RT5PMNDpM; fr=0XA2ffNCTIX85IrMe.AWVODgSYpMci5QzcFCieZBGECZI.BkyWCe.87.AAA.0.0.BkyWCe.AWXInXTM4X4

*Figure 8 - List of cookies and values embedded into HTTP Request sent to Facebook by NASCAR's Pixel*

119.   The   string   "100091959850832"   can   be   appended   to   www.facebook.com/, such that www.facebook.com/100091959850832

---

[61] *In re Nickelodeon Consumer Privacy Litigation,* 827 F.3d 262, 290 (3d Cir. 2016).
[62] *See Lebakken v. WebMD, LLC* 2022 U.S. Dist. LEXIS 201010, at *11-12 (N.D. Ga. Nov. 4, 2022); *Czarnionka v. Epoch Times Ass'n,* 2022 U.S. Dist. LEXIS 209067, at *8-10 (S.D.N.Y. Nov. 17, 2022); *Ambrose v. Boston Globe Media Partners, LLC*, 2022 U.S. Dist. LEXIS 168403, at *5-6 (D. Mass. Sept. 19, 2022).

leads directly to the Facebook user who last logged in to the browser and visited the Website.

120.   Here, the result would appear, to a stranger, as depicted below:



*Figure 9 - The Facebook profile that appears when navigating to www.facebook.com/100091959850832*

121.   Defendant shares subscribers' PVI via separate Facebook Pixel events, including the PageView and MicroData Pixel Events. The PageView Pixel Event triggers as soon as the Pixel is loaded onto the user's browser.[63] The MicroData event triggers whenever a webpage containing metadata tags established by NASCAR is loaded onto the user's browser.[64]

122.   The PageView event's inclusion of users' PII and web watching data, including video title, is depicted above in *Figure 9 above*.

123.   Microdata events are triggered whenever a web page containing

---

[63] *Meta for Developers: Conversion Tracking*, FACEBOOK https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited August 2, 2023).
[64] *What are the Subscribedbuttonclick and MicroData events and can/should I disable this?*, FARMER'S RANDOM WEB/AD TECH PROBLEMS, Dec. 28, 2017, http://randomproblems.com/subscribedbuttonclick-microdata-events-can-disable-facebook-pixel-autoconfig-feature/ (last visited August 2, 2023).

Microdata tags is loaded.[65]

124.   Microdata tags allow developers to embed metadata within the contents of a web page.[66]

125.   This metadata includes the title and description of a video – for example, here, "title": "Jessica Hook details challenges of turning Next Gen car into Garage 56 entry"; or, "meta:description" "Corey Lajoei talks with Jessica Hook, the Garage 56 project's 'Chief of Staff,' about getting the car ready for the 25 Hours of Le Mans[]" on the Website, as depicted below *Figure 10*:



*Figure 10, Microdata Event sends Microdata tag for video's title to Facebook.[67]*

---

[65] *Facebook Microdata Installing Schema*, CAT HOWELL https://cathowell.com/facebook-microdata-what-it-is-how-to-set-it-up/ (last visited on August 2, 2023).
[66]     *Meta    for    Developers:    Microdata    Tags*,    FACEBOOK https://developers.facebook.com/docs/marketing-api/catalog/guides/microdata-tags/ (last visited on August 2, 2023).
[67] *Jessica Hook details challenges of turning Next Gen car into Garage 56 entry*, NASCAR (June 1, 2023) https://www.nascar.com/video/franchise/stacking-

126.   The Microdata Event's HTTP Headers also include the c_user cookie of the subscriber in the same transmission as the Payload. This is depicted below in *Figure 11*:



*Figure 11 - Embedded c_user cookie in Pixel Request transmitted to Facebook[68]*

127.   Both the Microdata and PageView events, when triggered, independently and automatically result in the sharing of subscribers' web watching data and PII (in the form of the user's Facebook UID) with Facebook.

### d.   NASCAR Was Told the Pixel Discloses Subscribers' Data; It Knew Precisely What the Pixel Would Collect and Share

128.   When a business applies with Facebook to use the Pixel, it is provided with detail about its functionality (site policy) including PVI.[69]

---

pennies/jessica-hook-details-challenges-of-turning-next-gen-car-into-garage-56-entry/ (last visited on August 2, 2023).
[68] *Id.*
[69] *See Meta for Developers: Get Started*, https://developers.facebook.com/docs/meta-pixel/get-started (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can their

129.  To make use of the Pixel, Defendant agreed to Facebook's Business Tool Terms (the "Business Terms").

130.  The Business Terms informs website owners using Facebook's tracking tools that the employment of the Pixel will result in data sharing, including with Facebook, through the automatic sharing of Pixel Event information and contact information.[70]

131.  Facebook directs parties implementing the Pixel—here, NASCAR—to encrypt request information[71] *before* data can be shared.  *Id.*

132.  Facebook further provides Pixel users, such as NASCAR, guidance on responsible data handling, and details how data is acquired, used, and stored, including which information is shared with Facebook.

133.  Facebook educates or reminds Pixel users of their responsibility to inform subscribers to the website's data sharing, and specifically guides website owners to obtain the requisite rights, permissions, or consents, before sharing information with any third-party.[72]

---

actions in the Facebook Ads Manager so you can use the data . . . By default, the Pixel will track URLs visited [and] domains visited . . . .") (last visited August 2, 2023).

[70] *Meta Business Tools Terms*, FACEBOOK https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJ OrkCsGodnMzth_uq6s4o3DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJlI&_rdr (last visited August 2, 2023).

[71] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent.  NASCAR has specifically chosen the Pixel method which makes users' information visible.  *See Id.*

[72] *Business Help Center: Best Practices for Privacy and Data Use for Meta Business Tools*, FACEBOOK

134.  As a sophisticated party entering into a business arrangement with another sophisticated party, NASCAR was on notice of the potential privacy violations that would result from use of the Pixel, and ignored Facebook's warnings to safely handle its subscribers' data and to warn its subscribers that the NASCAR Website would disclose information in a manner that threatened subscribers' VPPA-protected PVI.

**D.**   **E-Newsletters and E-Subscriptions, Even When Free to Users, Are a Value Exchange Between the Teams and Subscribers**

135.  Visitors to the Website are prompted and encouraged to subscribe to the Website newsletter, as shown above in *Figure 1*.

136.  By signing up to the e-newsletter, subscribers are granted access to regular emailed updates and information, including pre-recorded videos or links to those videos, without having to first visit the website directly. Subscribes are provided exclusive discounts, event promotions, ticket offers, fundraising, special event notifications, premium seating, and hospitality, along with other weekly newsletter content. Subscribing to an e-newsletter allows users to stay up to date on the latest news, race results,

https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited August 2, 2023).

events, and promotions related to NASCAR. E-newsletter subscribers may also receive exclusive discounts on NASCAR tickets.[73]

137.   NASCAR benefits from the value created through its use of free e-newsletters and its subscription-based service model.

138.   In addition to driving website traffic, e-newsletters and other email marketing tactics deliver the highest and most measurable return on investment of all marketing channels.[74] Sports related email marketing fare even better.[75] Marketing through the use of email has the benefit of being trackable,[76] and e-newsletters offer website operators insight into subscribers' interests and bases for targeting subscribers for future marketing efforts.[77]

139.   With 99 percent of users checking their email daily,[78] some as

---

[73] *Why Consumers Subscribe and Unsubscribe from Email [New Data]*, HUBSPOT, https://blog.hubspot.com/marketing/why-consumers-subscribe-to-email (last visited August 2, 2023).
[74] *What is the Average Email Marketing ROI?*, CONSTANT CONTACT, https://www.constantcontact.com/blog/what-is-the-roi-of-email-marketing/ (last visited August 2, 2023).
[75] *Id.*
[76] *The 7 Advantages of Having an Email Newsletter*, COMPOSE.LY, https://compose.ly/content-strategy/advantages-of-having-a-newsletter (last visited August 2, 2023).
[77] *Id.*
[78] Luisa Zhou, *Email Marketing ROI Statistics: The Ultimate List in 2023*, LUISA ZHOU, https://www.luisazhou.com/blog/email-marketing-roi-statistics/ (last visited August 2, 2023).

much as 20 times a day,[79] it is not surprising that websites seek to engage users regularly with emails through e-newsletters.

140.  The effectiveness of NASCAR's email marketing has not gone unnoticed.  In a cross-platform promotion for a NASCAR series streamed on Facebook, Facebook noted that NASCAR drove awareness by "promoting the content through its other digital assets – email marketing campaigns and website."[80]

141.  Overall, a user with either a newsletter subscription becomes a part of the Website's ecosystem and provides various benefits to the Website.

**E.    The NASCAR Website Newsletters Contain or Link to Videos on the NASCAR Website**

142.  The NASCAR Website newsletters contain breaking news, video access, and more, *see supra* ¶ 94, figure 5, all directly linked to the Website, or to a sub-page on the Website.

143.  NASCAR newsletters include links to articles, videos, photo galleries, and race results.  *See supra* ¶ 4, figure 1.

---

[79] *Conversion Rate Optimization Blog: 40+ Email Marketing Statistics You Need to Know for 2023*, OPTINMONSTER, https://optinmonster.com/email-marketing-statistics/ (last visited August 2, 2023).

[80] *Meta For Media: NASCAR and Bubba Wallace Find Marketing Formula for Facebook Watch*, FACEBOOK https://www.facebook.com/formedia/blog/nascar-and-bubba-wallace-find-marketing-formula-for-facebook-watch (last visited August 2, 2023).

144. A screenshot of the newsletter shows that various videos are clickable through the NASCAR Newsletter, which includes play buttons near the title of the video, as depicted below:



Figure *12*, Screenshots of videos within NASCAR's Newsletter

145. These videos, as presented only to subscribers in the newsletter, directs subscribers to a webpage on the NASCAR Website, which auto-play immediately upon reaching the Website from the newsletter.

146. Just like all other videos on the NASCAR Websites, the NASCAR Website pages linked from the newsletters include the Pixel, and track and disclose subscribers' Private Viewing Information to Facebook within a single transmission.

**F.    Sign-up for the NASCAR Subscription Lacks Informed, Written Consent Pursuant to the VPPA**

147.  The Website does not seek nor obtain permission from subscribers, including Plaintiffs and the Class, to share the subscribers' PII or web watching history with third-parties, including Facebook.

148.  The sign-up process for the Website's newsletter does not seek or obtain informed, written consent.

149.  To the extent information about any of the Website's data sharing can be located, the language is not (i) presented to users of the site in a transparent manner, or where it must be viewed by visitors to the website; (ii)  made available as part of the sign-up process; (iii) offered to users as checkbox or e-signature field, or as any form of consent; and (iv) presented in terms that sufficiently warn users that their information, protected by the VPPA, will be shared with a third party. *See, supra,* ¶ 4, Figure 1.

## TOLLING

150.  The statutes of limitations applicable to Plaintiffs' and the Class claims were tolled by Defendant's conduct and Plaintiffs' and Class Members' delayed discovery of their claims.

151.  As alleged above, Plaintiffs and members of the Class did not know and could not have known when they used the Website that Defendant was disclosing their information and communications to third parties.

Plaintiffs and members of the Classes could not have discovered Defendant's unlawful conduct with reasonable diligence.

152.   Defendant secretly incorporated the Facebook Pixel into the Website, providing no indication to subscribers and visitors that their communications would be disclosed to these third parties.

153.   Defendant had exclusive and superior knowledge that the tracking entities' tracking tools incorporated on its Website would disclose visitors' protected and private information and confidential communications, yet failed to disclose to visitors that by interacting with the Website that Plaintiffs' and Class Members' Video Watching Data would be disclosed to third parties.

154.   Plaintiffs and Members of the Class could not with due diligence have discovered the full scope of Defendant's conduct because the incorporation of the tracking entities' tracking tools is highly technical and there were no disclosures or other indication that would inform a reasonable consumer or Website user that Defendant was disclosing and allowing the interception of such information to these third parties.

155.   The earliest Plaintiffs and Class Members could have known about Defendant's conduct was in connection with their investigation and the work done on their behalf in preparation of filing of this Complaint.

## CLASS ACTION ALLEGATIONS

156.   Plaintiffs bring this action individually and on behalf of the following Classes:

> All persons in the United States with a subscription to the Website that had their Personal Viewing Information improperly disclosed to Facebook through the use of the Facebook Pixel (the "Class").

157.   Specifically excluded from the Class are Defendant, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

158.   Plaintiffs reserve the right to amend the Class definition above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

159.   This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

160.   Numerosity (Rule 23(a)(1)): At this time, Plaintiffs do not know the exact number of members of the aforementioned Class. However, given

the popularity of Defendant's Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

161.    Typicality of Claims (Rule 23(a)(3)): Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, subscribed to, and used, the Website to watch videos, and had their PII collected and disclosed by Defendant.

162.    Adequacy of Representation (Rule 23(a)(4)): Plaintiffs will fairly and adequately represent and protect the interests of the Class.    Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

163.    Superiority (Rule 23(b)(3)): A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members is relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein.  If Class treatment of these claims is not available, Defendant will likely continue their wrongful conduct, will unjustly retain

improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

164. <u>Commonality and Predominance (Rule 23(a)(2), 23(b)(3))</u>: There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

a. Whether Defendant collected Plaintiffs' and the Class's PII and Video Watching Data;

b. Whether Defendant unlawfully disclosed and continue to disclose the PII and Video Watching Data of subscribers of the Website in violation of the VPPA;

c. Whether Defendant's disclosures were committed knowingly; and

d. Whether Defendant disclosed Plaintiffs' and the Class's PII and Video Watching Data without consent.

165. Information concerning Defendant's Website data sharing practices and subscription members are available from Defendant's or third-party records.

166.   Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

167.   The prosecution of separate actions by individual members of the Classes would run the risk of inconsistent or varying adjudications, and establish incompatible standards of conduct for Defendant.  Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

168.   Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

169.   Given that Defendant's conduct is ongoing, monetary damages are insufficient and there is no complete and adequate remedy at law.

## COUNT I

### VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT
### 18 U.S.C. § 2710, *et seq*.
### (On Behalf of Plaintiffs and the Class)

170.   Plaintiffs hereby incorporate by reference and re-allege herein the allegations contained in all preceding paragraphs of this complaint.

171.   Plaintiffs bring this count on behalf of themselves and all members of the Class.

172.   The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1).

173.   "Personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

174.   A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

175.   Defendant violated this statute by knowingly disclosing Plaintiffs' and other Class members' personally identifiable information to Facebook.

176.   Defendant, through the Website, engages in the business of delivering video content to subscribers, including Plaintiffs and the other Class members, and other users. The Website delivers videos to subscribers, including Plaintiffs and the other Class members, by making those materials electronically available to Plaintiffs and the other Class members on the Website.

177.   Defendant is a "video tape service providers" because they create, host, and deliver hundreds of videos on the Website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4)

178.   Defendant solicits individuals to subscribe to the Website newsletters that advertise and promote videos and articles on the Website.

179.   Plaintiffs and members of the Class are "consumers" because they subscribed to the newsletters. 18 U.S.C. § 2710(a)(1).

180.   Plaintiffs and members of the Class viewed video clips on the Website.

181.   Defendant disclosed Plaintiffs' and Class Members' personally identifiable information to Facebook. Defendant utilized the Pixel which forced Plaintiffs' web browser to transfer Plaintiffs' identifying information, like their Facebook ID, along with Plaintiffs' and Class Members' event data, including the title of the videos they viewed.

182.   Defendant knowingly disclosed Plaintiffs' and Class Members' PII, which is triggered automatically through Defendant's use of the Pixel. No additional steps on the part of the Defendant, Facebook, or any third-party is required.   Once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com  (e.g.,  www.facebook.com/[UID_here]).    That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

183.  The VPPA provides that a videotape service provider may disclose personally identifiable information concerning a consumer as long as that person has provided "informed written consent . . . in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b)(2)(A)(i).

184.   Plaintiffs and members of the Class did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to Facebook.  Defendant failed to obtain "informed, written consent" from subscribers—including Plaintiffs and members of the Class—"in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" and "at the election of the consumer," either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner." 18 U.S.C. § 2710(b)(2)(B)(i)–(ii).

185.   Defendant's disclosure of Plaintiffs' and Class Members' Video Watching Data and PII were not made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendant's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

186.   In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendant failed to provide an opportunity to opt out as required by the VPPA.

187.  On behalf of themselves and the Classes, Plaintiffs seek: (i) declaratory relief as to Defendant; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

<u>Injunctive Relief of Defendant's Ongoing VPPA Violations</u>

188.  An actual and immediate controversy has arisen and now exists between Plaintiffs and the putative classes they seek to represent, and Defendant, which parties have genuine and opposing interest in and which their interests are direct and substantial. Defendant has violated, and continue to violate, Plaintiffs' and Class Members' rights to protect their PII under the VPPA.

189.  Plaintiffs have demonstrated that they are likely to succeed on the merits of their claims, and are thus entitled to declaratory and injunctive relief.

190.  Plaintiffs have no adequate remedy at law to stop the continuing violations of the VPPA by Defendant. Unless enjoined by the Court, Defendant will continue to infringe on the privacy rights of Plaintiffs and the absent Class Members, and will continue to cause, or allow to be caused,

irreparable harm to Plaintiffs. Injunctive relief is in the public interest to protect the PII of Plaintiffs, and other consumers that would be irreparably harmed through continued disclosure of their PII.

191.    NASCAR completely disregards their obligation under the VPPA by loading the Facebook Pixel, onto the Website and facilitating the sharing of subscribers' PII with third parties for any ordinary person to access and use.

192.    Despite brazenly violating the VPPA, subscribers were provided with no notice of the employment of the Pixel and no indication of how or how much of their information was shared with third parties.  Worse, in further violation of the VPPA, Defendant did not seek or obtain any form of consent from subscribers for the use of the tracking tools to share information improperly pulled from the Website.

193.  This threat of injury to Plaintiffs and members of the Class from the continuous violations requires temporary, preliminary, and permanent injunctive relief to ensure their PII is protected from future disclosure.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a) For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

(b) For an order declaring the Defendant's conduct violates the statute referenced herein;

(c) For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d) Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to requiring Defendant to immediately (i) remove the Facebook Pixel from the Website or (ii) add, and obtain, the appropriate consent from subscribers;

(e) For damages in amounts to be determined by the Court and/or jury;

(f) An award of statutory damages or penalties to the extent available;

(g) For Defendant to pay $2,500.00 to Plaintiffs and member of the Class, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(h) For pre-judgment interest on all amounts awarded;

(i) For an order of restitution and all other forms of monetary relief;

(j) An award of all reasonable attorneys' fees and costs; and

(k)  Such other and further relief as the Court deems necessary and appropriate.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs demand a trial by jury of all issues so triable.

Dated: August 11, 2023          **EDELSBERG LAW**

By: */s/ Adam A. Schwartzbaum*
Adam A. Schwartzbaum (Fla. Bar No. 93014)
Scott A. Edelsberg (Fla. Bar No. 100537)
20900 NE 30TH Ave #417
Aventura, FL 33180
Telephone: (786) 289-9471
Email: scott@edelsberglaw.com
Email: adam@edelsberglaw.com

Mark S. Reich*
Courtney Maccarone*
Gary S. Ishimoto*
**LEVI & KORSINSKY, LLP**
55 Broadway, 4th Floor, Suite 427
New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: cmaccarone@zlk.com
Email: gishimoto@zlk.com

*Counsel for Plaintiffs*

**pro hac vice* forthcoming